UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NUMBER |
| **DAVID H. SCHEUERMANN** | **05-13562** |
| **MARTINA TERAN SCHEUERMANN** | SECTION A |
| DEBTORS | CHAPTER 13 |

## REASONS FOR DECISION

This matter came before the Court on June 1, 2006 on the confirmation of the Chapter 13 Plan of debtors, David H. and Martina Teran Scheuermann ("Debtors"). Bonomolo Limousines, Inc., a Louisiana corporation, and creditor in this case, ("Bonomolo") objected to confirmation.

**I. Facts**

The relevant facts span over fifteen years and three bankruptcy cases.

**A. The 1990 Bankruptcy Case**

On July 17, 1990, Debtors filed a voluntary petition for relief under Title 11, Chapter 7 of the United States Bankruptcy Code.[1] Bonomolo filed an adversary proceeding[2] alleging that the amounts due by Debtors to it were non-dischargeable. Specifically, Bonomolo alleged that Debtor, David Scheuermann, sold a limousine placed on consignment by Bonomolo with Scheuermann and failed to remit to Bonomolo the proceeds he received from a subsequent transfer. On February 25, 1992, judgment was rendered in favor of Bonomolo and against David Scheuermann in the amount of $24,000 plus legal interest from date until paid ("Bankruptcy Judgment").[3] The Bankruptcy Judgment also found the debt non-dischargeable. Appeals followed, and on October 28, 1993, the

---

[1] The case bears matter no. 90-12611.

[2] Adversary no. 90-1252

[3] 90-1252, Pleading 21.

United States Court of Appeal for the Fifth Circuit affirmed the Bankruptcy Judgment.[4] No further appeal was taken, and the Bankruptcy Judgment is now final. Bonomolo recorded the Bankruptcy Judgment in the mortgage records for the Parish of Jefferson, State of Louisiana on March 24, 1993.[5]

On March 9, 1993, the adversary proceeding was closed. On January 29, 2002, it was reopened for the limited purpose of reviving the Bankruptcy Judgment. After the filing of a Complaint to Revive, a judgment of revival was granted on February 27, 2003 and the adversary proceeding was again closed. Bonomolo recorded the judgment of revival in the mortgage records of Jefferson Parish, State of Louisiana[6] and re-recorded the Bankruptcy Judgment on March 6, 2002.

Debtors were granted a discharge on all, otherwise dischargeable, obligations on November 26,1990.

### B. The 1993 Bankruptcy Case

On April 19, 1993, Debtors filed a voluntary petition for relief under Title 11, Chapter 13 of the United States Bankruptcy Code.[7] Under a consent agreement between Debtors and Bonomolo, Debtors' confirmed plan did not provide for the payment of Bonomolo. On November 8, 1994, this Court rendered an Order disallowing Bonomolo's proof of claim as a debt not provided by Debtors' plan, and requiring Debtors to pay the claim, in full, outside of the plan ("Consent Judgment").[8]

---

[4] *In re Scheuermann*, 8 F.3d 22 (5th Cir. 1993).

[5] Instrument no. 9314569.

[6] Instrument no. 10313249

[7] The case bears matter no. 93-11411.

[8] 93-11411, Pleading 51.

On September 3, 1998, Debtors completed their plan, and an Order of Discharge was entered. Pursuant to §1328(a), the completion of payments under the chapter 13 plan discharged Debtors from all debts provided for by the plan. Since this Court specifically found that Bonomolo's debts were not provided by the plan, they were not discharged.

On September 10, 1993, Debtors' case was closed.

**C. The 2005 Bankruptcy Case**

On May 3, 2005, Debtors filed another voluntary petition for relief under Title 11, Chapter 13 of the United States Bankruptcy Code, now pending before this Court. On Debtors' Schedule of Assets and Liabilities, they listed Bonomolo as a creditor with a secured claim of $24,000. According to Debtors, the claims of Bonomolo were collateralized by a judicial lien against Debtors' family home located at 1 Monte Carlo Drive, Kenner, Louisiana (the "Property"). Debtors also scheduled a claim of Northwest Bank Minnesota/ Litton Loan in the amount of $182,449.40, secured by the same Property.

Initially, Debtors scheduled the value of the Property as $165,000, claiming $25,000 as exempt pursuant to La. R.S. 21:1. No party challenged Debtors' claim to a homestead exemption. Debtors also scheduled Bonomolo as the holder of an unsecured claim in the amount of $24,000.

Litton Loan Servicing LP ("Litton"), as successor in interest to Northwest Bank Minnesota, filed a proof of claim, later amended, in the amount of $122,387.74, plus arrearages of $57,214.82.[9]

---

[9] Claim nos. 2 and 14.

3

In Debtors' chapter 13 Plan,[10] Debtors propose to pay $800 per month for 14 months, then $1465.00 per month for the next 44 months, to the Chapter 13 Trustee. From these sums, Debtors will pay $1294 to their counsel for administrative claims, the Chapter 13 Trustee's statutory commission, and priority claims held by the Louisiana Department of Revenue. The Plan also provides payments of $57,214.82 in mortgage arrears due Litton and payments of $8,2464.63 to outstanding unsecured claimants. Pursuant to 11 U.S.C. §522(f), Debtors' Plan seeks to avoid the judicial lien of Bonomolo and treat its claims as unsecured.

Bonomolo objected to the confirmation of Debtors' Plan. Bonomolo's proof of claim is comprised of the entire original principal balance awarded under the Bankruptcy Judgment, as well as, judicial interest from the date rendered to the petition date. Because Debtors' Plan fails to allow for the retention of Bonomolo's lien, and it does not provide the value, as of the effective date of the Plan, of Bonomolo's allowed, secured claim, Bonomolo argues that the Plan is unconfirmable . *See* 11 U.S.C. §1325(a)(5).

**II. Standing**

Debtors have objected to Bonomolo's standing to oppose confirmation. For the reasons orally assigned at the trial on the merits, this Court held that Bonomolo had standing to oppose confirmation. Bonomolo's proof of claim asserts a fully secured claim against property of the estate and Debtors. Thus, until objected to and disallowed, the claim is *prima facie* evidence of the secured

---

[10] Debtors filed their original plan on June 20, 2005 (Pleading 8) which was amended on May 5, 2006 (Pleading 34 ) (collectively referred to as "Plan").

4

debt.[11]  As a result, unless and until this Court determines that the Property lacks sufficient value to secure the claims of Bonomolo, Bonomolo has standing to object as a secured claimant in the case.

### III. Value of the Property

If secured, Bonomolo is entitled to receive, under the Plan, an amount equivalent to the value of its allowed, secured claim.  Any portion of Bonomolo's claim which is undersecured, may be bifurcated and added to the unsecured creditor class scheduled to receive an estimated 4% *pro rata* distribution.[12]

Bonomolo's Objection turns on the value of the Property.  To the extent the Property's fair market value, as of the petition date, exceeds the value of priming liens and Debtors' homestead exemption under state law, Bonomolo may be secured.[13]  Based on the proofs of claim on file, Litton has a secured claim, first in rank, in the amount of $179,602.56.  When the Louisiana homestead exemption of $25,000 is considered, the Property must be worth in excess of $204,603.00 for any portion of Bonomolo's claim to be secured.

At the confirmation hearing, Debtors offered the opinion of Albert S. Pappalardo, a New Orleans appraiser.  Mr. Pappalardo's opinion used three comparable properties to determine the market value of the Property.  Out of several properties sold within the last year in Debtors'

---

[11] *Simmons v. Savell (In re Simmons)*, 765 F.2d 547 (5th Cir. 1985).

[12] 11 U.S.C. §§ 1325(a)(5) and 506(a)(1).  Section 1322(b)(2) prevents a plan from modifying the rights of holders of secured claims, in real property that is debtor's principal residence.  11 U.S.C. 101(51) defines a "security interest" as a lien created by agreement.  Therefore, because a judicial lien is a nonconsensual lien, it is subject to modification under §1322(b)(2).

[13] The value of the collateral is determined as of the petition date.  *Chase Manhattan Bank USA, N.A. v Stembridge (In re Stembridge)*, 394 F.3d 383 (5th Cir. 2004).

neighborhood, Mr. Pappalardo picked three with locations 1, 3 and 4 blocks from the Property. The sale prices for these comparables ranged from $244,000-255,000. One property (located one block from the subject property and on Debtors' street) was identified in excellent condition with a price per square foot of $113.13. The other two were marked as average in condition with a price per square foot of $87.18.

Mr. Pappalardo further testified that he believed the Property was in poor condition as a result of deferred maintenance. Mr. Pappalardo noted as items in need of repair, a broken Jacuzzi motor; an inoperable toilet; peeling wallpaper, interior and exterior paint[14]; a dislodged front column on the exterior porch; and a shower stall needing replacement. Mr. Pappalardo did not determine the actual costs of repair, but believed the market value of the Property should be reduced by $75,000 due to these conditions.

Mr. Pappalardo concluded that a property similar to the comparables would have a value of $255,000. After deducting $75,000 for loss of market value due to needed repairs, Mr. Pappalardo's conclusion was that Property had a market value of $180,000.

Bonomolo called Johnny Nyein, another New Orleans appraiser. Mr. Nyein's opinion was based on six comparables to the Property spanning two time periods, May 2005 and May 2006. Based on these comparables, Mr. Nyein found little change in market value over the year. Of the six properties examined, Mr. Nyein picked four within one block of the Property. The two other comparables were within 2 blocks. The properties located within one block of the Property all sold for a consistent price per foot ($111.11-137.76), despite variations in condition from good to excellent. These prices were also consistent with the comparable property selected by Mr.

---

[14] The exterior of the house is brick with only the trim in wood.

Pappalardo and located within a block of the subject.

Mr. Nyein acknowledged the repairs noted by Mr. Pappalardo and discounted the condition of the property to "good," consistent with criteria established under the Uniform Standards of Professional Appraisal Practices. Mr. Nyein explained that under Uniform Standards of Professional Appraisal Practices, properties are classified into one of five levels of condition: poor, average, good, very good, or excellent. Variations between condition are subjective, but Uniform Standards of Professional Appraisal Practices dictate that differences between the condition levels generally only result in a range of 0-10% off market value. For example, a $300,000 home in excellent condition would appraise for $300,000-$270,00 if only in very good condition. He also testified that a home in poor condition, the lowest possible condition level, would be uninhabitable under these standards. This testimony was not rebutted.

Taking all of this into account, Mr. Nyein believes the Property to have a value between $275,000-$280,000.

The Court finds that the value of properties in Debtors' neighborhood and located within a block of the Property to be $111.11 per square foot. As set forth above, nine comparables were offered into evidence, five of which were located within one block of the Property. The lowest price per square foot realized on these comparables was $111.11 per square foot. The properties in this price range were identified as in good to very good condition.

The Court also finds Mr. Nyein's testimony as to variations in condition, and their effect on market value, to be persuasive. Mr. Nyein offered six comparables, four of which were located within a block of the Property and were very consistent in value. The condition of these comparables was similar to the Property, and the Court found Mr. Nyein's explanation as to

adjustments for condition credible.

On the other hand, Mr. Pappalardo's testimony was not persuasive. Mr. Pappalardo itemized cosmetic deficiencies easily repaired for substantially less than the $75,000 deduction taken. This deduction amounts to 30% off his starting price. The basis for such an extreme deduction was not adequately explained given the relatively minor repairs needed. Further, based on these repairs, Mr. Pappalardo further opined that the Property was in poor condition. According to Mr. Nyein, this evaluation is not supported by the Uniform Standards of Professional Appraisal Practices, and Debtors did not rebut this testimony..

Based on the comparables submitted to the Court, the properties located within a block of the subject are very similar in style, age, type of construction, lot size, square footage and amenities. Mr. Pappalardo's selection of comparables at further distances from the Property was not sufficiently explained. By adding comparables at further distances, Mr. Pappalardo was able to substantially reduce the price per square foot for the Property without sufficient justification.

Debtors' home has 2,750 square feet. Based on a price per square foot of $111.11, the Court finds that a comparable home, in very good-good condition would have a value of $305,000. However, deducting for a variation in condition of one level, good- average, results in a value of $274,500. As a result, the Court values the Property at $274,500 as of the date of the filing of the petition.

### IV. Treatment of Bonomolo's claims under the Plan

Section 1325(a)(5) provides that in order for the Court to confirm a plan, either (1) the holder of the secured claim has accepted the plan; (2) the plan provides that the secured creditor retain its lien and receive distributions under the plan equal or greater than the allowed amount of the claim;

or (3) the debtor surrender the property securing the claim. Because the Plan does not comply with section 1325(a)(5), confirmation will be denied.

### V. Res Judicata Effect of the Consent Judgment and Claims of Bad Faith

Because the Court will deny confirmation based on the treatment of Bonomolo under the Plan, the Court finds it unnecessary to reach the issues of bad faith and the *res judicata* effect of the Consent Judgment.

### VII. Conclusion

The Court finds that the Plan does not comply with section 1325(a)(5). Accordingly, confirmation will be denied. An appropriate order will be entered.

New Orleans, Louisiana, August 25, 2006.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge